16730

CITY OF SPARTANBURG v. BLALOCK *ET AL.*

(75 S. E. (2d) 360)

254

*Messrs. Holcombe & Bomar,* and *Sam R. Watt,* of Spartanburg, and *Huger Sinkler,* of Charleston, *for Appellants,*

*Mr. E. W. Johnson,* of Spartanburg, *for Respondent,*

April 1, 1953.

Oxner, Justice.

This action was brought by the City of Spartanburg for a declaratory judgment with respect to the power of City Council to fix water rates, dispose of any unpledged revenue, and otherwise manage and control the fiscal affairs of the waterworks system of the City of Spartanburg. In another cause of action, the Court is asked to determine the validity of certain policies and practices followed by the Commissioners of Public Works. Named as defendants were the Commissioners, the Secretary and Treasurer of the Spartanburg Waterworks and its Superintendent, and also The Citizens and Southern National Bank. The last named defendant is the custodian of certain waterworks funds, but is not interested in the controversy and was joined as a party solely in order that it might be bound and protected by any judgment rendered. The contest is in reality between the City Council of Spartanburg and the Commissioners of Public Works.

The case was heard by the Court below on the facts stated in the pleadings. It appears that in 1907, pursuant to the authority contained in Article 8, Section 5 of the Constitution, as implemented by Act No. 39 of the Acts of 1896, 22 St. at L. ,83, the City of Spartanburg, after a favorable election, acquired its water system and thereafter issued bonds to pay for it. In 1908, as provided by the Statute of 1896, a Board of Commissioners of Public Works was elected. Since that time the waterworks system of Spartanburg has been continuously operated, managed and controlled by the Commissioners of Public Works, who have disbursed the proceeds of all bonds issued for water purposes, fixed the water rates, and otherwise directed the fiscal affairs.

In 1938, it was decided to make improvements and additions to the water system at an estimated cost of $625,000.00. The Federal Government was then following a policy of making outright grants to defray a portion of the cost of such a project. A grant of 45% was obtained for this undertaking. After making allowance for same and the use of certain surplus funds, it became necessary to borrow the sum of $300,000.00, which was done under the terms of Act No. 299 of the Acts of 1933, 38 St. at L. 411.

The City Council contends that as long as any revenue bonds issued in 1938 remain outstanding, it has the sole power and authority, under the terms of the Act of 1933, to prescribe the water rates, to determine the respective amounts that should be paid into the various funds required to be set aside by the 1933 Act, to dispose of any revenue remaining, and to otherwise manage and control the financial affairs of the waterworks system.

The Commissioners assert that the 1933 Act constitutes merely a vehicle by which a municipality or other political subdivision might issue and sell revenue bonds, and that this act can, and should be, harmonized with the Act of 1896, under which the Commissioners have heretofore controlled and managed the waterworks system, by leaving the powers previously vested in the Commissioners unimpaired so long

as the covenants and contractual obligations made on behalf of the municipality with the bondholders, as required by the 1933 act, were fulfilled.

The Court below, after stating that many of the provisions in the Act of 1896 were in conflict and could not be reconciled with certain provisions in the Act of 1933, sustained the foregoing contentions made by the City Council, and further held that some of the challenged practices and expenditures made by the Commissioners were ultra vires. From this order, the Commissioners of Public Works have appealed.

It is apparent from the foregoing statement that the answer to the principal question presented on this appeal depends upon the construction which should be given to (1) Act No. 39 of the Acts of 1896, 22 St. at L. 83, which, with amendments, is now embodied in Sections 7280, 7281, 7283, 7284 and 7293 of the 1942 Code; and (2) Act No. 299 of the 1933 Acts of the General Assembly, 38 St. at L. 411, which, with amendments, now constitutes Chapter 187, Volume 4 of the Code of 1942. These two acts, including the amendments, will hereinafter for convenience be referred to as the Act of 1896 and the Act of 1933. A detailed review of these statutes would unduly lengthen this opinion. We shall only briefly summarize the portions pertinent to this controversy.

The Act of 1896 authorizes cities and towns to issue bonds for the construction and operation of waterworks, if approved at an election held for that purpose. The bonds so issued are to be paid by an *ad valorem* tax. It further provides that at the election on the question of the issuance of bonds, there shall also be elected three commissioners of public works, who shall be vested with the power to construct and operate such waterworks and "shall have full control and management of same." The commissioners are further empowered to prescribe the rates and charges to be made for the use of water. The proceeds of any bonds issued

are required to be turned over to the commissioners to be disbursed by them for the purposes above mentioned.

The foregoing act has been amended in a number of particulars. Among these amendments is a requirement that the board of commissioners shall each month make a full statement to the city council of their receipts and disbursements during the preceding month, and shall incur no indebtedness without the concurrence of that body.

In *City of Union v. Sartor,* 91 S. C. 248, 74 S. E. 496, the Court was called upon to determine the legal status and powers of commissioners of public works and their relation to the municipality and to the city council. There were several views expressed in the opinions, but that of Mr. Justice Woods, concurred in by Mr. Justice Hydrick, appears to be the one followed by this Court in subsequent decisions, including the recent case of *Welling v. Clinton Newberry Natural Gas Authority,* 221 S. C. 417, 71 S. E. (2d) 7. That distinguished Jurist concluded (1) that the city council is not the municipality, but merely an agency of the municipality, having no authority except that conferred by the statute, either expressly or by necessary implication; (2) that the city council is not expressly given any authority or power in the management of municipal waterworks, and no such authority can be implied because the General Assembly denied the city council such power by conferring it on the board of commissioners of public works; (3) that the board of commissioners is not in any sense a separate corporation but a mere municipal agency, through whose management and control the General Assembly has required that the municipality shall operate and manage its waterworks; (4) that the power conferred by the statute on the board of commissioners includes all powers necessarily incident to the operation and management of the waterworks, including the power to fix rates for the use of water, which must be reasonable and free from unfair discrimination; and (5) that the manifest purpose of the statutory requirement that the board of commissioners shall make a full statement

monthly to the city council of receipts and disbursements was not only to provide a safeguard against official misconduct, but to enable the city council to scrutinize the account and object to excessive charges.

Under the construction given the 1896 statute in the *Sartor case,* it would seem clear that the full control and management of the waterworks system of Spartanburg, including the power to fix rates and to generally determine the fiscal policies to be followed, was vested in the Board of Commissioners. Was this power divested by the Act of 1933, and, if not, to what extent, if any, was it restricted or impaired?

In construing the 1933 Act, it is proper to consider the history of the period in which it was passed. *Greenville Baseball, Inc., v. Bearden, Sheriff,* 200 S. C. 363, 20 S. E. (2d) 813. We were then in the midst of a severe depression. Unemployment was widespread. There was a crisis in our economy. The Federal Government sought to alleviate this condition by encouraging public works, and made liberal grants for this purpose. The reluctance of the taxpayers to further burden themselves by the issuance of general obligation bonds was realized. Then, too, this method of financing in many instances was cumbersome and time consuming. Many municipalities and counties had incurred bonded indebtedness up to the maximum permitted by the Constitution. To enable the states, counties, cities and other units of government to raise money for the purpose of supplementing Federal grants, a comparatively new method of financing was adopted whereby bonds issued for public projects would be secured solely by the revenue to be derived from the project undertaken. It is well known that proposed bills for this purpose were frequently prepared in Washington and enacted hurriedly by the states with little or no effort made toward harmonizing or integrating the proposed legislation with existing statutes. In this connection, it may be of interest to note that during the 1933 session, three other acts similar to Act No. 299

were passed by the General Assembly. See Acts Nos. 106, 119, and 236 of the Acts of 1933. It clearly appears that the act now under consideration was passed in furtherance of the foregoing purpose, but any doubt thereabout was completely removed by an amendment made in 1934, 38 St. at L. 1543, wherein it was stated that the intention of the act was to enable the borrower "to qualify for the securing of the loan available from the Public Works Administration of the Federal Government and any other right, privilege or immunity granted by any Act of the Congress of the United States or any Board, Commission, Agency or Instrumentality thereof."

The 1933 act is an omnibus measure. It not only empowers counties, townships, municipalities and other political subdivisions to issue revenue bonds for the construction and improvement of water, sewer, light and gas systems, but also authorizes the issuance of such bonds for the construction of public buildings and utilities of various kinds and numerous recreational projects, such as golf courses, swimming pools and parks. All bonds issued under the act are secured solely by the revenue to be derived from the project undertaken. To protect the bondholders, the borrower is required out of the gross revenue to set up and keep segegated four distinct accounts: (1) A "Bond and Interest Redemption Fund" for the payment of principal and interest on the bonds, (2) an "Operation and Maintenance Fund" for the expenses of operation and maintenance, (3) a "Depreciation Fund" to take care of depreciation, and (4) a "Contingent Fund" to provide a reserve for later improvements and extensions. The bonds so issued constitute a lien on the system or project. The unit of government involved is required to maintain sufficient rates to provide the necessary amounts in the respective funds above mentioned. The procedure outlined in the act, so far as pertinent to the issues before us, is to the following effect: The governing body of the borrower is required to adopt an ordinance describing the contemplated project and the estimated cost, specifying the amount of

bonds to be issued and naming the maximum rate of interest, time and place of payment, etc., fixing the rates to be charged for the services, agreeing that the bonds so issued shall constitute a lien on the system or project undertaken, and covenanting that the borrower shall at all times maintain rates, which may be revised as it becomes necessary, sufficient to provide for the four funds heretofore mentioned. The governing body is also required to designate some banking institution as custodian of the gross revenue derived from the operation of the project, which banking institution must agree to keep segregated the four funds mentioned. The act further provides that if any surplus remains after providing for the accounts above described, it shall be disposed of by the governing body for the best interest of the borrower.

Having now summarized the pertinent portions of both acts, we shall proceed to determine whether the power to fix the rates and otherwise handle the fiscal affairs of the waterworks system given to commissioners of public works under the Act of 1896 was taken away from them and vested in the city council of any municipality issuing revenue bonds under the Act of 1933. Of course, the 1933 Act, being the last expression of the legislative will, controls if there are any conflicting provisions in the two statutes. But this rule "is to be resorted to only when there is clearly an irreconcilable conflict, and all other means of interpretation have been exhausted." *Feldman v. South Carolina Tax Commission,* 203 S. C. 49, 26 S. E. (2d) 22, 24. The 1933 Act contains no general or specific repealing clause. In fact, it makes no reference to the Act of 1896. If any portion of the 1896 Act was repealed, it must be by implication. Repeals by implication are not favored. In *Pearson v. Mills Manufacturing Company,* 82 S. C. 506, 64 S. E. 407, 409, the Court said: "The authorities agree that, to effect a repeal by implication on account of repugnancy, the repugnancy must not only be plain, but the provisions of the two statutes must be incapable of any reasonable reconcilement; for, if they can be construed so that both can stand,

the court will so construe them." To warrant a repeal by implication, "the two acts must be directly antagonistic and repugnant, and there must be such a positive repugnancy as to admit of no other reasonable construction." *State v. Hood,* 181 S. C. 488, 188 S. E. 134, 136.

Not only is there an absence of either a general or specific repealing clause in the Act of 1933, but in Section 2 of the statute, Section 9241 of the Code of 1942, it is provided that the act shall be construed as cumulative authority for the purposes therein named and "shall not be construed to repeal any existing laws with respect thereto". And in the 1934 amendment, 38 St. at L. 1392, Section 9276 of the 1942 Code, it is stated that the act "shall be cumulative to other acts, general or special, with respect both to the powers conferred and the procedure authorized."

While we do not agree with appellants' counsel that the task is an "easy" one, it is our conclusion that the two statutes can be reconciled and both permitted to stand. On first impression there are several provisions in the two acts which appear to be repugnant, but more mature consideration leads rather definitely to the conclusion that the Legislature did not intend to change the fundamental law relating to the autonomy of the board of public works. We think the 1933 act was intended to merely provide a convenient vehicle for the issuance of revenue bonds. It must be presumed that the Legislature was familiar with the powers vested in boards of commissioners by the Act of 1896 and if there was any intention to divest them of these powers, it is fair to assume that an express provisions would have been inserted to that effect. The provisions in the 1933 act relating to segregation of funds and maintenance of sufficient rates to adequately provide for same and the appointment of a custodian thereof were obviously inserted solely for the protection of the bondholders. If the commissioners should fail to provide sufficient rates or otherwise neglect to comply with the requirements for the protection of the bondholders, no doubt the city council could compel them to do

so. It seems that the 1933 act contemplates that the city council and the board of commissioners should be cooperative agencies in constructing or expanding a waterworks system. This is true to some extent under the Act of 1896, which provides that the amount of bonds to be issued shall be determined by the city council and that the council shall provide a tax levy sufficient to pay the principal and interest on such bonds. Similarly under the Act of 1933, the city council covenants and agrees that there shall be compliance with the terms of the act providing for the protection of the bondholders. Its duties extend no further.

Under the construction advanced by respondent, the powers and duties vested in any board of commissioners would depend on whether the municipality elected to issue revenue bonds under the Act of 1933. If no bonds were issued, the fiscal affairs of the waterworks system would be directed by the commissioners, but if bonds were issued, control would be vested in the city council. It is unreasonable to suppose that the Legislature intended such an unusual result.

Respondent emphasizes that the Act of 1933 requires that the ordinance providing for the issuance of the bonds and prescribing the rates to be charged shall be passed by the "governing body" of the borrower; that the "governing body" shall designate the bank which shall act as custodian of the gross revenue; that the "governing body" shall provide for the setting up of the various funds specified in the act; and that the act provides that "Any surplus revenues thereafter remaining shall be disposed of by the governing body of the borrower as it may determine from time to time to be for the best interest of the borrower." Our attention is further called to the fact that it was the City Council and not the Board of Commissioners of Public Works which passed the ordinance in 1938 authorizing the issuance of revenue bonds in the sum of $300,000 and that in this ordinance, the City Council fixed the rates to be charged, the various amounts to be set aside in the funds required by the act, and

covenanted that the City of Spartanburg would at all times maintain adequate water rates to provide for these funds. Mention is also made of the fact that it was the City Council that passed the resolution designating the bank which would act as the custodian of the revenue. It is argued that all of the foregoing necessarily contemplated that the City Council should fix the rates, determine the amounts to be set aside monthly in the various funds, and dispose of any surplus revenue.

The term "governing body" is defined in the act, in the case of a municipality, as "the Board of Commissioners, the Mayor and Council, or other like governing body thereof." It is not altogether clear under this definition whether the term "governing body," when revenue bonds for the construction or expansion of waterworks are issued, means the city council or the board of commissioners of public works. Assuming that it refers to the city council, we think that body was selected solely as an agency to comply with requirements which the act made for the protection of the bondholders. The duties imposed are only of a supervisory nature and the power given to the city council was not intended to extend beyond insuring that the covenants made by it would be performed. The quoted provision of the act to the effect that the governing body may dispose of any unpledged revenue means no more or less than the bondholders have no further interest in the revenues derived from a project after the several funds prescribed for their benefit have been established, and any surplus revenues remaining should go where the general law requires.

We think respondent's counsel give undue significance to the fact that the ordinance authorizing the issuance of the bonds was passed by the City Council and not the Board of Commissioners, and that the City Council also passed the resolution appointing the Citizens and Southern National Bank as custodian of the revenue. The record shows that the Board of Commissioners of Public Works adopted a resolution requesting the City Council

to pass this ordinance and covenanted for itself and its successors to maintain rates necessary to meet the requirements of the ordinance and to do and perform all other things required of it by reason of the adoption of said ordinance. The Board of Commissioners further adopted a resolution requesting the City Council to pass the resolution designating the Citizens and Southern National Bank as custodian of the gross revenue to be derived from the waterworks system. Evidently the City Council did not think at that time that it alone had the power to direct the fiscal affairs of the waterworks system of Spartanburg. The resolutions by the Board of Commissioners might have also been passed for the purpose of removing any uncertainty as to which body was the "governing body" within the contemplation of the 1933 Act. At this point it should be stated that we find no basis for respondent's contention that the Commissioners are estopped by the ordinance and resolutions mentioned to deny that the City Council has full control and management of the fiscal affairs of the waterworks system.

The view which we have taken seems to be in accord with the construction given to the 1933 act by the Legislature. It appears that in 1934, the Commissioners of Public Works of Spartanburg were authorized to increase their salaries to $1200 per year. 38 St. at L. 1473. It is not reasonable to suppose that this would have been done if these Commissioners had been previously divested of all power relating to the fiscal management of the waterworks. The functions remaining would have been entirely too unimportant to warrant an increase in salary. By reference to Section 59-174 of the Code of 1952, it will be seen that since 1933, in a number of municipalities the board of commissioners of public works has been abolished and the duties, powers and responsibilities of such board vested in the city or town council. Would the General Assembly have found it necessary to make these special enactments if under the 1933 statute the duties and responsibilities of boards of commissioners had already been removed and vested in the city councils? In 1950, 46 St. at L.

3374, it was provided that in the Town of Seneca the existing rates for the sale of water or electricity could not be raised or lowered without the approval of the Town Council. If respondent's contention is correct, this act was entirely unnecessary.

It is our conclusion that the power to fix rates, dispose of surplus revenue, and otherwise control and direct the fiscal policies of the waterworks system of the City of Spartanburg is vested in the Commissioners of Public Works so long as that body fulfills the covenants and agreements for the protection of the bondholders set forth in the ordinance authorizing the issuance of revenue bonds, but if the Commissioners fail or neglect to carry out these covenants and obligations, the City Council may enforce compliance. If, as respondent argues, it is necessary for the orderly and efficient administration of the affairs of the City of Spartanburg that the powers mentioned should be vested in the City Council, with the Board of Commissioners as a mere agency of that body, the remedy lies in the legislature and not in the courts.

It follows from the foregoing that the City Council was without authority to pass the resolution of August 3, 1951, purporting to take away from the Commissioners and give to the City Council the right to dispose of surplus revenues.

Complaint is made of the action of the Board of Commissioners in maintaining several accounts besides those mentioned in the ordinance and the act under which the bonds were issued. It appears that they keep a general account into which daily deposits are made, and from which the necessary amounts are paid monthly into the four funds prescribed by the act. We find nothing in the act which prohibits the Commissioners from maintaining other accounts or establishing on their books a surplus reserve. It is also claimed that the Commissioners have charged off for depreciation and contingencies amounts in excess of that specified in the ordinance authorizing the issuance of the

revenue bonds. But it would seem clear that the amounts named in the ordinance are only minimum requirements for the protection of the bondholders and may be increased if found necessary for the proper administration of the waterworks system. Of course, if the action of the Commissioners in this or any other respect should be arbitrary or amount to a clear abuse of discretion, such action would be subject to review and correction.

Attack is also made on Section 7675-53(3) of the 1942 Code which permits the lending of unemployed funds belonging to the Spartanburg Metropolitan District to the municipal waterworks system for a period not exceeding six months and authorizes the securing of this loan by a pledge of the net revenue arising from the operation of the waterworks system. It is contended that this legislation, which was enacted in 1934, is special legislation of the sort prohibited by Section 34, Article 3 of the Constitution. It has been consistently held by this Court that legislation authorizing special financing of this kind does not come within the constitutional inhibition mentioned. *State ex rel. Milford v. Brock,* 66 S. C. 357, 44 S. E. 931; *Burriss v. Brock,* 95 S. C. 104, 79 S. E. 193; *Brownlee v. Brock,* 107 S. C. 230, 92 S. E. 477; *Sullivan v. City Council of Charleston,* 133 S. C. 156, 130 S. E. 872. It is also argued that the Act of 1933 prohibits the issuance of further obligations secured by a pledge of revenue derived from the waterworks system. Not only does the act contain no such prohibition but additional revenue bonds are expressly permitted by an amendment in 1945. 44 St. at L. 269. Of course, any subsequent obligations would be junior in lien to those previously issued.

The remaining questions relate to alleged unlawful expenditure of revenue funds by the Commissioners. Respondent claims that the Commissioners ran unnecessary newspaper advertisements; that funds were improperly used for entertaining; and that funds were illegally used for purchasing automobiles which were then resold to

certain employees. The facts and circumstances under which these expenditures were made are not sufficiently set forth in the record to enable us to pass upon the legality of same. A request for a declaratory judgment with respect to these matters is refused and we are not to be understood as indicating any opinion thereabout.

So much of the order of the Court below as is challenged by the exceptions is reversed.

BAKER, C. J., and FISHBURNE and STUKES, JJ., concur.

TAYLOR, J., not participating.