PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES ISLAND PUBLIC SERVICE
DISTRICT,
*Plaintiff-Appellee,*

v.

CITY OF CHARLESTON, SOUTH
CAROLINA,
*Defendant-Appellant,*

and

ANDREW C. SMITH, treasurer of
Charleston County, in his official
capacity; TOWN OF FOLLY BEACH;
PEGGY MOSELEY, auditor of
Charleston County, in her official
capacity; WILLIAM O. THOMAS, JR.,
*Defendants.*

No. 00-1910

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Falcon B. Hawkins, Senior District Judge.
(CA-96-3557-2-11)

Argued: April 4, 2001

Decided: May 7, 2001

Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** William B. Regan, REGAN, CANTWELL & STENT, Charleston, South Carolina, for Appellant. Trent Marrs Kernodle, KERNODLE, TAYLOR & ROOT, Charleston, South Carolina, for Appellee. **ON BRIEF:** Frances I. Cantwell, Carl W. Stent, REGAN, CANTWELL & STENT, Charleston, South Carolina, for Appellant.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

The James Island Public Service District, which provides fire protection services to rural areas in South Carolina, seeks protection under § 306(D) of the Consolidated Farm and Rural Development Act, 7 U.S.C. § 1926(b) (1994), against certain actions taken by the City of Charleston. The district court found the District entitled to this protection. We affirm.

I.

Congress enacted the Agricultural Act of 1961 in part to provide insured loans to sparsely populated rural communities for a variety of otherwise unaffordable services and improvements. *See* S. Rep. No. 566 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2243, 2305-06. One portion of the Act, formerly known as the Farmers Home Administration Act (FmHA), but renamed the Consolidated Farm and Rural Development Act in 1972, authorizes federal loans to non-profit local associations to provide water service and other "essential community facilities" to farmers and other rural residents. 7 U.S.C. § 1926(a).

As a condition of accepting these loans, Congress has always required that:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the

granting of any private franchise for similar service within such area during the term of such loan.

7 U.S.C. § 1926(b).

The very same year in which Congress originally enacted this legislation, the South Carolina legislature created the James Island Public Service District ("James Island" or "the District") to provide various services, including fire protection, to rural residents. *See* 1961 S.C. Act No. 498. In order to purchase and maintain fire-fighting equipment and facilities, James Island, since its inception, has obtained loans from the federal government by selling bonds first to the FmHA and then to its successor, the Rural Development Association (RDA).

During this period, from 1961 to the present, the City of Charleston has, at various times, annexed portions of James Island as it is generally empowered to do under South Carolina law. *See* S.C. Code Ann. § 5-3-310 (Law. Co-op. Supp. 1998). After annexation, the City historically has provided services, including fire protection services, to those areas formerly served by James Island. In addition, after annexation, the City has taxed the former James Island residents, just as it taxes all of its residents. Prior to annexation, these taxpayers would have paid taxes to James Island, which used a portion of these taxes to pay down its federal debt to the RDA and operate and maintain its fire department.

In 1996, after a spate of annexations by the City, James Island filed this action in federal court seeking declaratory and injunctive relief. James Island alleged that by providing fire service and diverting tax monies away from James Island, the City violated 7 U.S.C. § 1926(b). The district court granted James Island's motion for summary judgment and issued the requested declaration and a permanent injunction, prohibiting the City from curtailing fire service and directing the City to allocate to James Island "a portion of tax revenues from the annexed properties to cover *both* the debt service taxes and the operating expenses/taxes of the James Island Public Service District Fire Service."[1] This appeal followed.

---

[1]This ruling does not conflict with *St. Andrews Public Service District v. Moseley*, 475 S.E.2d 750 (S.C. 1996), which simply decided that, as

## II.

The United States Constitution authorizes Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).

Although broad, the congressional spending power has limits. Federal expenditures must (1) benefit the general welfare, and the conditions imposed on their receipt must be (2) unambiguous, (3) "reasonably related to the purpose of the expenditure," and (4) cannot violate "any independent constitutional prohibition." *New York v. United States*, 505 U.S. 144, 171-72 (1992); *see also Dole*, 483 U.S. at 207-08. Further, "in some circumstances the financial inducement [to comply with a condition attached to funds] offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *Id.* at 211 (internal quotation marks omitted).

Unquestionably, and unquestioned by the City, the RDA funds provided to James Island benefit the general welfare, and § 1926(b) imposes conditions on South Carolina and its political subdivisions that are unambiguous and reasonably related to the purpose of the RDA loans. Thus, the first three restrictions on Congress's power

---

a matter of state law, when a city annexes property of a special purpose district that property does not remain in the district for purposes of taxation. *See id.* at 753. James Island does not suggest to the contrary. Furthermore, contrary to suggestions by the City, James Island does not seek to interfere with the City's annexations or "to evade the annexation laws of South Carolina." Brief of Appellant at 10. Nor did the district court in any way "requir[e] that South Carolina alter its laws relating to municipal boundaries." *Id.* at 16. James Island has never challenged the annexations themselves or the state law governing annexation, and the district court issued no ruling interfering with either.

under the Spending Clause have been met. Moreover, as in *Dole*, the "conditional grant of federal money" at issue here cannot be held "unconstitutional [coercion] simply by reason of its success in achieving the congressional objective." *Id.* Indeed, the City does not suggest that § 1926 transgresses *Dole*'s "coercion" limitation.

The City argues, however, that the fourth restriction — forbidding violation of "any independent constitutional prohibition" — has not been met. Specifically, the City contends that the State did not "consent" to the conditions of § 1926(b), and thus the statute's application violates the Tenth Amendment.[2] This claim ignores the fundamental precept that the "Tenth Amendment itself *does not* act as a constitutional bar [to Congress's spending power]; rather, the fourth restriction [on Congress's spending power] stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) (emphasis added). *See also New York*, 505 U.S. at 173 ("Because the [federal expenditure] is supported by affirmative constitutional grants of power to Congress [under the Spending Clause], it is not inconsistent with the Tenth Amendment."); *Dole*, 483 U.S. at 210 ("[A] perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants . . . . Instead, we think that the [fourth restriction] stands for the unexceptionable proposition that the [spending] power may not be used to induce States to engage in activities that would themselves be unconstitutional . . . . [F]or example, a grant of federal funds conditioned on invidiously discriminatory state action. . . .").

Although the Tenth Amendment does not independently invalidate the conditions of a federal spending program, a state receiving federal funds must "voluntarily and knowingly accept[ ]" those conditions. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[L]egislation enacted pursuant to the spending power is

---

[2]The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'").

Courts usually cite the Supreme Court's language in *Pennhurst* in the context of determining whether a federal spending program unambiguously notifies the fund recipient of the attached conditions, thus allowing for voluntary and knowing acceptance. *See, e.g.*, *Bell Atl. Md, Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279, 292 (4th Cir. 2001) ("Congress' grant to States of conditional funds is 'in the nature of a contract,' the legitimacy of which 'rests on whether the State voluntarily and knowingly accepts the terms.' *Pennhurst I*, 451 U.S. at 17 . . . . By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their acceptance from Congress of a gift or gratuity."). Although there is no suggestion in this case that the conditions set forth in § 1926(b) are anything but clear, the City seems to argue that South Carolina refused to "agree" or "consent" to those conditions.

The City apparently maintains that South Carolina did not agree or consent to the conditions imposed by § 1926(b) because the State assertedly did not authorize James Island to issue and sell general obligation bonds — those paid and secured by general James Island taxes — to the federal government to receive RDA loans. Rather, according to the City, the State only authorized James Island to issue revenue bonds — those paid and secured by fees for fire protection — to obtain loans from the RDA.[3] This argument must fail in light

---

[3]Throughout this litigation the City has attempted to distinguish general obligation bonds from revenue bonds on the basis that a reduction in the James Island service district area would not endanger the income source available to repay general obligation bonds as it would for revenue bonds. This distinction is mistaken. Just as removing fee-paying customers from a district's boundaries injures its ability to repay bonds secured by those fees, so too does removing tax-paying residents from the district's boundaries injure its ability to repay general obligation bonds secured by those taxes. Depending on the kind of bond, James Island would either have to raise the remaining residents' service fees or their taxes to meet its debt obligations.

of express provisions in the South Carolina Constitution, the South Carolina Code, and the James Island enabling act.[4]

It is undisputed that the Constitution of South Carolina specifically provides special purpose districts, like James Island, with the power to incur bonded general obligation debt. *See* S.C. Const. art. X, § 14(2)(a). Moreover, the South Carolina General Assembly has directed that special purpose districts may sell "[s]uch bonds . . . at private sale to the United States of America or any agency or department thereof." S.C. Code Ann. § 11-27-90(b) (Law. Co-op. 1976). *See also* S.C. Code Ann. § 6-11-490 (Law. Co-op. 1976) ("If, in order to provide for the cost of any improvements, it is necessary that general obligation bonds be issued the county board shall be empowered at any time to authorize the applicable commission to issue general obligation bonds of the special purpose district."). Furthermore, in creating the James Island district, the South Carolina legislature expressly authorized it to issue and sell general obligation bonds to the United States. *See* 1961 S.C. Act No. 498, §§ 11, 13, 14 (James Island enabling act).

Not only has the South Carolina General Assembly granted special purpose districts, like James Island, the power to obtain loans from the RDA, it has also prohibited municipalities, like the City, from taking actions that impinge on the districts' ability to pay the RDA loans or on the protections afforded the districts under § 1926(b). Section 6-11-250 of the South Carolina Code states:

> Government loans.
>
> The board of commissioners of any electric light, water supply, fire protection or sewerage district may avail itself of

---

[4]It may be that James Island's mere "acceptance of the funds triggers coverage under" § 1926(b). *See United States Dept. of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). We do not address that question because James Island does not advance such a contention and because in this case, as explained in text, the State did far more than merely accept funds; in its constitution and statutes (and in practice), it clearly signaled its acceptance of and consent to the conditions attached to the RDA funds set forth in § 1926(b).

any provision for loans to construct electric light systems, water supply systems, fire protection systems or sewerage systems from the United States Government, through any office or agency thereof, and may issue revenue bonds pledging the income from any such system in liquidation of any loan made as aforesaid by the United States Government.

S.C. Code Ann. § 6-11-250 (Law. Co-op. 1976). Section 5-3-312(5) adds that:

In no event may any provision be incorporated in any plan [of annexation] which will impair the rights of bondholders, or which will impair the statutory liens created by . . . *Title 7 of the United States Code, Section 1926(b)*, or which will accelerate the requirement to repay bonds, or which would violate the conditions of any grant.

S.C. Code Ann. § 5-3-312(5) (Law. Co-op. Supp. 1998) (emphasis added). Thus, South Carolina has acknowledged the limits set by § 1926(b) and has clearly agreed to bind itself and its political subdivisions (including cities) to the obligations attendant to an RDA loan, specifically including the obligation under § 1926(b) to insure that the "service provided or made available through any such [district] shall not be curtailed or limited by inclusion of the area served by such [district] within the boundaries of any municipal corporation or other public body." 7 U.S.C. § 1926(b).

The City, however, insists that South Carolina has empowered special purpose districts to obtain RDA loans solely by the issuance of revenue bonds, and not by the issuance of general obligation bonds. This argument is based on the second clause of § 6-11-250, which states that a district can avail itself of federal loans, "and may issue *revenue bonds* pledging the income from any such system in liquidation of any loan made as aforesaid by the United States Government." S.C. Code Ann. § 6-11-250 (emphasis added). According to the City, this clause should be read as a restriction, permitting special purpose districts to issue and sell *only* revenue bonds (and not general obligation bonds) to obtain federal loans.

But the language of § 6-11-250's second clause is not restrictive. Rather, it is permissive and adds to the first clause: a district can avail itself of federal loans "*and may* issue revenue bonds." S.C. Code Ann. § 6-11-250 (emphasis added). That language does not at all limit James Island's authority to "avail itself of any provision for loans to construct . . . fire protection systems . . . from the United States Government," S.C. Code Ann. § 6-11-250, or to sell general obligation bonds to the United States, S.C. Code Ann. § 11-27-90(b).

The history of the revenue bond clause confirms that, rather than limiting special purpose districts, it provides them with an added, permissive power. The South Carolina General Assembly initially enacted that provision in 1934, *see* 1934 S.C. Act No. 734, § 8, in the wake of a 1933 statute that first empowered municipalities to issue revenue bonds. 1933 S.C. Act No. 299, 38 Stat. at Large 411. The 1933 act was passed in part as a response to the effects of the Great Depression. *City of Spartanburg v. Blalock*, 75 S.E.2d 361, 365 (S.C. 1953). Because at that time many taxpayers were reluctant "to further burden themselves by the issuance of general obligation bonds," and because general obligation bonds were often "cumbersome and time consuming," a "comparatively new method of financing was adopted whereby bonds issued for public projects would be secured solely by the revenue to be derived from that project undertaken." *Id.* Pressing economic difficulties led the South Carolina legislature to enact the revenue bond statutes "with little or no effort made toward harmonizing or integrating the proposed legislation with existing statutes," *id.*, including those permitting municipalities to issue general obligation bonds. Given this context, we cannot read the permissively written second clause of § 6-11-250 as a prohibition on the traditional power of political subdivisions to issue general obligation bonds. Rather, the clause merely constitutes an attempt to clarify that political subdivisions can *also* employ revenue bonds, a "comparatively new method of financing," to secure federal loans.

We note that the established state practice entirely accords with this conclusion. James Island has obtained RDA loans by issuing general obligation bonds since at least 1980. Moreover, the District files annual audits and reports with the State, specifying that it "issues General Obligation Bonds to provide funds for the acquisition and construction of major capital facilities" and that "[a]ll of the general

obligation bonds are held by the" RDA. Neither the State of South Carolina nor Charleston County, in which James Island is located, has ever suggested that in doing so James Island has acted ultra vires.

In sum, we hold that South Carolina empowered James Island to issue general obligation bonds to obtain RDA loans, and thus agreed to the conditions unambiguously set forth in 7 U.S.C. § 1926(b). As such, § 1926(b) constitutes a valid exercise of Congress's spending power, and thus does not violate the Tenth Amendment.

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.[5]

---

[5]The City's fallback argument, that it can only be enjoined from taking the portion of taxes that the District used to service its RDA debt and not the taxes allocable to the District's provision of fire service more generally, is meritless. Section 1926(b) protects from curtailment or limitation not only the ability of James Island to pay its federal debt, but also the "*service provided*" by the District. 7 U.S.C. § 1926(b) (emphasis added). Thus, § 1926(b) safeguards James Island's "ability to repay its federal loan and to provide low per[ ]user cost to its customers." *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517, 524 (4th Cir. 1999). "[B]oth of these goals depend on economies of scale and maximization of [the district's] entire customer base, and can only be accomplished by treating the protection as applicable to the entire service area rather than merely the increments improved by the loan." *Id. See also North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 915 (5th Cir. 1996).