UNITED STATES DEPARTMENT OF TRANSPORTA-
TION ET AL. *v.* PARALYZED VETERANS
OF AMERICA ET AL.

No. 85–289.   Argued March 26, 1986—Decided June 27, 1986

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. MAR-SHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 613.

*Solicitor General Fried* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Reynolds, Deputy Solicitor General Kuhl, Deputy Assistant Attorney General Disler, Kathryn A. Oberly,* and *Miriam R. Eisenstein.*

*Douglas L. Parker* argued the cause for respondents. With him on the brief were *Arlene Battis* and *Karen Peltz Strauss.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the Air Transport Association of America by *James E. Landry;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *William S. Franklin;* and for the International Air Transport Association by *Gordon Dean Booth, Jr.,* and *Robert Glasser.*

*William C. Gleisner III* filed a brief for the National Federation of the Blind as *amicus curiae* urging affirmance.

JUSTICE POWELL delivered the opinion of the Court.

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against handicapped persons in any program or activity receiving federal financial assistance. The United States provides financial assistance to airport operators through grants from a Trust Fund created by the Airport and Airway Development Act of 1970. The Government also operates a nationwide air traffic control system. This case presents the question whether, by virtue of such federal assistance, § 504 is applicable to commercial airlines.[1]

## I

Respondents successfully challenged regulations promulgated by the Civil Aeronautics Board (CAB) to implement § 504 of the Rehabilitation Act of 1973, 87 Stat. 390, as amended; 29 U. S. C. § 790 *et seq.* (1982 ed. and Supp. II). To understand respondents' arguments, it is necessary to review the process by which the regulations were promulgated.

### A. *The Rulemaking Process*

Section 504 provides:

"No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U. S. C. § 794.

The statute did not specifically provide for administrative implementation. In 1976, however, the President issued Executive Order No. 11914, 3 CFR 117 (1976–1980), calling on the

---

[1] As used herein, the term "airport operator" refers to the various entities that own or manage airports and that have authority to apply for planning or development grants from the Trust Fund. "Commercial airlines" refers to all passenger carriers formerly certificated by the Civil Aeronautics Board.

Secretary of Health, Education, and Welfare[2] to coordinate rulemaking under § 504 by all federal agencies. At that time two federal agencies were principally concerned with aviation: the Federal Aviation Administration (FAA), which is primarily concerned with the Air Traffic Control System and the safety of airline operations, including airports, and CAB, which was primarily concerned with economic regulation of the airline industry.[3] Because § 504 had been modeled after Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*,[4] both FAA and CAB patterned their proposed rules after the regulations issued to implement Title VI.

### 1. The Notice of Proposed Rulemaking Under § 504

CAB issued a Notice of Proposed Rulemaking on June 6, 1979.[5] CAB concluded that its authority under § 504 was limited to those few airlines that receive a subsidy under § 406(b) or § 419 of the Federal Aviation Act.[6] CAB an-

---

[2] This responsibility later was transferred to the Secretary of Health and Human Services when the Department of Health, Education and Welfare was divided into the Department of Education and the Department of Health and Human Services. See The Department of Education Organization Act, Pub. L. 96–88, 93 Stat. 669, codified at 20 U. S. C. § 3401 *et seq.*

[3] The FAA became part of the Department of Transportation (DOT) in 1966. CAB later was disbanded and its functions largely transferred to DOT under the Civil Aeronautics Board Sunset Act of 1984, Pub. L. 98–443, 98 Stat. 1703 *et seq.*

[4] Title VI is the congressional model for subsequently enacted statutes prohibiting discrimination in federally assisted programs or activities. We have relied on case law interpreting Title VI as generally applicable to later statutes. See *Grove City College* v. *Bell*, 465 U. S. 555, 566 (1984); see also S. Rep. No. 93–1297, p. 39 (1974).

[5] Notice of Proposed Rulemaking, Part 382, Nondiscrimination on the Basis of Handicap, 44 Fed. Reg. 32 401 (1979).

[6] 49 U. S. C. App. §§ 1376(b) and 1389 (1982 ed. and Supp. II). Section 406 created a program designed to guarantee the air service necessary to transport mail to small communities. That program was terminated in 1982. In 1978, CAB began operating the "section 419 program" in order to subsidize small community and other essential air service that would not

nounced its intention, however, to go beyond its § 504 jurisdiction in order to regulate the activities of all commercial airlines. CAB relied on its authority under § 404 of the Federal Aviation Act of 1958, 49 U. S. C. App. § 1374.

Section 404 contains two provisions relevant here: § 404(a)(1), requiring all air carriers to "provide safe and adequate service, equipment, and facilities," and § 404(b), prohibiting carriers from "subjecting any particular person . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." CAB explained that "the proposed rules would emphasize that the handicapped are protected by the adequacy of service and antidiscrimination provisions of Section 404 . . . which are applicable to all air carriers, whether or not receiving Federal financial assistance." 44 Fed. Reg. 32401–32402 (1979). Somewhat inexplicably, CAB relied on both provisions of § 404 taken together to support its regulatory authority over the on-board activities of air carriers, even though it was aware that, under the Airline Deregulation Act of 1978,[7] the antidiscrimination provision of § 404(b) would lapse as of Janu-

otherwise be provided. See Airline Deregulation Act of 1978, Pub. L. 95–504, § 33, 92 Stat. 1732. This program will operate through 1988.

CAB's decision not to regulate the on-board activities of commercial airlines was consistent with administrative practice under Title VI, which prohibits racial discrimination in any program or activity receiving federal financial assistance. None of the agencies concerned with aviation attempted to regulate the on-board activities of commercial airlines under Title VI. Thus, the consistent administrative interpretation of the program-specific language of Title VI and § 504 has been that it does not cover commercial airlines, unless the airline itself received subsidies from CAB. See 14 CFR § 379.2 (1965), 29 Fed. Reg. 19287 (1964) (CAB); 14 CFR § 15.5(c) (1965), 29 Fed. Reg. 19283 (1964) (FAA). That interpretation of the statutes by the agencies charged with their enforcement in the area of aviation is entitled to deference. *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 566 (1980).

[7]Pub. L. 95–504, § 40(a), 92 Stat. 1705, 1744 (codified at 49 U. S. C. App. § 1551 (a)(2)(B)).

ary 1, 1983, and only § 404(a)(1), requiring "safe and adequate service," would remain in effect.

## 2. The Final Regulations

CAB received public comment on the proposed regulations. Several airlines and the Air Transport Association challenged CAB's regulatory jurisdiction over the airlines. In the interim, Executive Order No. 12250, 3 CFR 298 (1981), transferred responsibility for coordinating the administration of various civil rights statutes, including § 504, from the Secretary of Health and Human Services to the Attorney General. After public comment and consultation with the Attorney General, CAB issued final regulations. 14 CFR pt. 382 (1986), 47 Fed. Reg. 25948 *et seq.* (1982).

The regulations have three subparts. Subpart A prohibits discrimination in air transportation against qualified handicapped persons. Subpart B contains specific, detailed requirements that must be followed by all air carriers in providing service to the handicapped. Subpart C sets forth compliance and enforcement mechanisms. As to all three subparts, CAB adhered to its original position that § 504 supported regulatory jurisdiction only over those carriers that receive funds under § 406 or § 419. CAB concluded, however, that the surviving portion of § 404—the "safe and adequate service" clause of § 404(a)(1)—did not support imposition of the specific provisions of subparts B and C on nonsubsidized carriers. Thus, those subparts would apply only to the extent authorized by § 504, that is, to carriers receiving subsidies under § 406 or § 419. CAB concluded, however, that it had authority to extend the reach of subpart A to all air carriers by virtue of § 404(a)(1)'s "safe and adequate service" clause. The Attorney General approved these regulations.

## B. *The Court of Appeals Decision*

Respondents Paralyzed Veterans of America and two other organizations representing handicapped individuals

(collectively PVA)[8] brought this action in the Court of Appeals for the District of Columbia Circuit. PVA challenged the substance of some of the regulations, as well as CAB's conclusion regarding its rulemaking authority under § 504. Only the latter claim is before us. On that issue, PVA contended that CAB's interpretation of the scope of its rulemaking authority under § 504 was inconsistent with congressional intent and controlling legal precedent.

The Court of Appeals agreed with PVA's position. *Paralyzed Veterans of America* v. *CAB*, 243 U. S. App. D. C. 237, 752 F. 2d 694 (1985). In the court's view, § 504 gave CAB jurisdiction over all air carriers by virtue of the extensive program of federal financial assistance to airports under the Airport and Airway Development Act of 1970, 49 U. S. C. § 1714, as amended (1976 ed., Supp. V).[9] The Court of Appeals found an additional source of financial assistance to airlines in the form of the air traffic control system in place at all major airports. The court vacated the regulations to the extent that their application was limited to carriers receiving funds under § 406 or § 419. It instructed DOT—CAB's successor agency after CAB was disbanded[10]— to issue new regulations that would apply to all commercial airlines.

We granted certiorari to resolve the question of the scope of DOT's regulatory jurisdiction under § 504. 474 U. S. 918 (1985). We now reverse.

## II

It may be helpful briefly to explain the limited nature of the question before us. This case does not present any challenge to CAB's interpretation of the scope of its regulatory jurisdiction under § 504. Nor is there any challenge to the appli-

---

[8] The other respondents are the American Council of the Blind and the American Coalition of Citizens with Disabilities.

[9] The 1970 Act has been replaced with the Airport and Airway Improvement Act of 1982, 49 U. S. C. App. § 2201 *et seq.*

[10] See n. 3, *supra.*

cation of subpart A—the general antidiscrimination regulation—to all commercial airlines. The only issue before us is the Court of Appeals' conclusion that § 504 applies to commercial airlines as recipients of federal financial assistance.

Section 504 prohibits discrimination against any qualified handicapped individual under "any program or activity receiving Federal financial assistance." We examine first the grants of federal funds to airport operators, which clearly are federal financial assistance, to determine whether it fairly can be said that commercial airlines "receive" these grants.

## A

The starting point of any inquiry into the application of a statute is the language of the statute itself. *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979). By its terms § 504 limits its coverage to the "program or activity" that "receiv[es]" federal financial assistance. At the outset, therefore, § 504 requires us to identify the recipient of the federal assistance. We look to the terms of the underlying grant statute.

The grant statutes relied on by the Court of Appeals are the Airport and Airway Improvement Act of 1982 (1982 Act), 49 U. S. C. App. § 2201 *et seq.*, and its predecessor statutes, particularly the Airport and Airway Development Act of 1970 (1970 Act), Pub. L. 91–258, 84 Stat. 219 *et seq.* (formerly codified at 49 U. S. C. § 1701 *et seq.* (1976 ed.)). The 1970 Act established the Airport and Airway Trust Fund, appropriations from which are used to fund airport development. The purpose of disbursements from the Trust Fund is to establish "a nationwide system of public airports adequate to meet the present and future needs of civil aeronautics." 84 Stat. 224. Congress directed the Secretary of Transportation to prepare a national airport system plan, *id.*, at 221, and required airport project applications to be consistent with that plan. *Id.*, at 226. In the 1982 Act Congress authorized disbursements from the Trust Fund for the Airport Improvement Program (AIP). Under AIP airport operators

submit project grant applications for "airport development or airport planning." 49 U. S. C. App. § 2201(a). Funds are disbursed for a variety of airport construction projects: *e. g.*, land acquisition, 14 CFR § 151.73 (1986); runway paving, § 151.77; and buildings, sidewalks, and parking, § 151.93. The use of the Trust Fund is strictly limited to projects that concern airports. See, *e. g.*, § 151.89 (authorizing road construction) ("Only those airport entrance roads that are definitely needed and are intended only as a way in and out of the airport are eligible").

It is not difficult to identify the recipient of federal financial assistance under these Acts: Congress has made it explicitly clear that these funds are to go to airport operators. Not a single penny of the money is given to the airlines. Thus, the recipient for purposes of § 504 is the *operator* of the airport and not its users.

Congress limited the scope of § 504 to those who actually "receive" federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds. "Congress apparently determined that it would require contractors and grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of federal funds." *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624, 633, n. 13 (1984). We relied on this same rationale in *Grove City College* v. *Bell*, 465 U. S. 555 (1984), where we noted that the recipient of the federal assistance—the college—was free to terminate its participation in the federal grant program and thus avoid the requirements of Title IX. *Id.*, at 565, n. 13. Under the program-specific statutes, Title VI, Title IX, and § 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision. See *Soberal-Perez* v. *Heckler*, 717 F. 2d 36, 41 (CA2 1983) ("This emphasis upon the contractual nature of the receipt of federal moneys in exchange

for a promise not to discriminate is still another reason to conclude that Title VI does not cover direct benefit programs since these programs do not entail any such contractual relationship"), cert. denied, 466 U. S. 929 (1984). By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to "receive" federal funds. In this case, the only parties in that position are the airport operators.

## B

Respondents attempt to avoid the straightforward conclusion that airlines are not recipients within the meaning of § 504 by arguing that airlines are "indirect recipients" of the aid to airports. They contend that the money given to airports is simply converted by the airports into nonmoney grants to airlines. Under this reasoning, federal assistance is disbursed to airport operators in the form of cash. The airport operators convert the cash into runways and give the federal assistance—now in the form of a runway—to the airlines. In support of this position, respondents point to the fact that many of the structures constructed at airports with aid from the Trust Fund are particularly beneficial to airlines, *e. g.*, runways, taxiways, and ramps. They also find support for their position in *Grove City*'s recognition that federal financial assistance could be either direct or indirect. This argument confuses intended *beneficiaries* with intended *recipients*. While we observed in *Grove City* that there is no "distinction between direct and indirect aid" and that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the Federal Government are subject to regulation," we made these statements in the context of determining whom Congress intended to receive the federal money, and thereby be covered by Title IX. 465 U. S., at 564. It was clear in *Grove City* that Congress' intended recipient was

the college, not the individual students to whom the checks were sent from the Government. It was this unusual disbursement pattern of money from the Government through an intermediary (the students) to the intended recipient that caused us to recognize that federal financial assistance could be received indirectly. While *Grove City* stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid. In this case, it is clear that the airlines do not actually receive the aid; they only benefit from the airports' use of the aid.

Respondents do not contend that airlines actually receive or are intended to receive money from the Trust Fund. Nor can they argue that the airport operators are, like the students in *Grove City*, mere conduits of the aid to its intended recipient, since, unlike the students, the airports are the intended recipients of the funds. Rather, respondents assert that the economic benefit to airlines from the aid to airports is a form of federal financial assistance. This position ignores the very distinction made by Congress in § 504, and recognized in *Grove City:* The statute covers those who receive the aid, but does not extend as far as those who benefit from it. In *Grove City* we recognized that most federal assistance has "economic ripple effects." We rejected the argument that those indirect economic benefits can trigger statutory coverage. *Id.*, at 572. Congress tied the regulatory authority to those programs or activities that *receive* federal financial assistance; the key is to identify the recipient of that assistance. In this case, it is clear that the recipients of the financial assistance extended by Congress under the Trust Fund are the airport operators.[11]

---

[11] This is not to say that Congress could not give federal financial assistance in the form of property improvements, such as a runway. Although the word "financial" usually indicates "money," federal financial assistance

C

By tying the scope of § 504 to economic benefit derived from Trust Fund expenditures, respondents would give § 504 almost limitless coverage. Congress' purpose in passing the Acts and establishing the Trust Fund was to confer economic benefits on a large number of persons and businesses. As the House Committee on Interstate and Foreign Commerce explained:

> "In addition to the actual users of the airport and airway system—such as airline passengers, general aviation, including private and business aviation operations, air freight forwarders, individual corporate and private shippers, etc.—there are others who benefit substantially from aviation; primarily, perhaps, the military should be considered. From a civilian standpoint those who benefit indirectly include the aircraft manufacturers and all of those whose employment is directly or indirectly related to aviation. To illustrate, an aircraft or aircraft component manufacturer may employ thousands of persons who never fly, yet those persons' economic lives depend entirely on aviation. More indirectly, but still to be considered, are those who make their livelihood by providing services for the manufacturers' employees. The employees of such corporations indirectly support such nonaviation interests such as real estate brokers and builders, doctors, dentists, school teachers, etc. This is brought forth here to establish the fact that air transportation in a true sense touches every American home, whether those in the home ever fly or not." H. R. Rep. No. 91–601, p. 6 (1969).

---

may take nonmoney form. Cf. *Grove City*, 465 U. S., at 564–565. Again, the relevant starting point is the grant statute. If it extends money, then the recipient for the purposes of § 504 is the entity that receives the money. If the grant statute extends something other than money, then the recipient is the entity that receives whatever thing of value is extended by the grant statute.

Even if the reach of § 504 were limited to those whom Congress specifically intended to benefit, the scope of the statute would be broad indeed, covering whole classes of persons and businesses with only an indirect relation to aviation. The statutory "limitation" on § 504's coverage would virtually disappear, a result Congress surely did not intend.

Respondents contend that distinctions can be drawn among classes of beneficiaries under the 1982 and 1970 Acts. In particular, they assert that the ultimate beneficiaries under the Acts are the passengers, while the economic benefit derived by the airlines is intended to aid the airlines in benefiting the passengers. Section 504 provides no basis for this distinction. Nor can we find a basis in the Trust Fund Acts for preferring passengers over other beneficiaries. Nowhere has Congress expressed a special intent to benefit passengers. Nor has it indicated that the economic benefit to airlines, either because it was more direct or for any other reason, makes them a recipient of federal financial assistance. Rather, Congress recognized a need to improve airports in order to benefit a wide variety of persons and entities, all of them classified together as beneficiaries.[12] Congress did not set up a system where passengers were the primary or direct beneficiaries, and all others benefited by the Acts are indirect recipients of the financial assistance to airports.

In almost any major federal program, Congress may intend to benefit a large class of persons, yet it may do so by fund-

---

[12] For example, Congress recognized that improved airports would not only satisfy the growing needs of commercial aviation, but also would help foster the significant growth that other areas of civil aviation were experiencing, including air carriers and passengers, air cargo carriers, air taxis, private business flying, and private recreational flying. H. R. Rep. No. 91–601, p. 5 (1969). In short, Congress intended to benefit interstate commerce in general through the means of aiding airports. In the 1970 Act, for example, Congress justified the expenditure because "substantial expansion and improvement of the airport and airway system is [sic] required to meet the demands of interstate commerce, the postal service, and the national defense." 84 Stat. 219. The 1982 Act contains a similar statement of purpose. 49 U. S. C. App. § 2201(a)(2).

ing—that is, extending federal financial assistance to—a limited class of recipients. Section 504, like Title IX in *Grove City*, draws the line of federal regulatory coverage between the recipient and the beneficiary.

## III

The Court of Appeals found that airports and airlines are "inextricably intertwined" and that the "indissoluble nexus between them is the provision of commercial air transportation." 243 U. S. App. D. C., at 257, 752 F. 2d, at 714. For these reasons, the Court of Appeals concluded that commercial airlines are part of a federally assisted program of "commercial air transportation" because they make use of airports that accept federal funds, and because airports are "indispensable" to air travel.

We find this reasoning overbroad and unpersuasive. The Court of Appeals defined "program or activity" in part by reference to who is benefited by the financial assistance to airports. See *id.*, at 257–258, 752 F. 2d, at 714–715. As shown above, regulatory coverage tied to the scope of the intended benefits of the Trust Fund Acts is inconsistent with congressional intent in passing § 504. We recognized in *Alexander* v. *Choate*, 469 U. S. 287, 299 (1985), that "[a]ny interpretation of § 504 must . . . be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." The Court of Appeals' reasoning extends § 504 beyond its bounds. Under the Court of Appeals' view various industries and institutions would become part of a federally assisted program or activity, not because they had received federal financial assistance, but because they are "inextricably intertwined" with an institution that has. For example, Congress, with the assistance of the States, has engaged in a mammoth program of interstate highway construction and maintenance. See the Federal-Aid Highway Act of 1956, Pub. L. 627, 70 Stat. 374. Congress in this pro-

gram used a Trust Fund approach similar to the Airport and Airway Development Act of 1970. If we accepted the Court of Appeals' construction of "program or activity," we would also be compelled to conclude that industries that depend on the federally funded highways for their existence, such as trucking firms and delivery services, are part of a program or activity of national highway transportation. The same could be said of federally supported port facilities. This interpretation of § 504 would give it a scope broader than its language implies, and one never intended by Congress.

The Court of Appeals' reliance on *Grove City* in support of its definition of the relevant program or activity is misplaced. In *Grove City*, despite the arguably "indissoluble nexus" among the various departments of a small college, we concluded that only the financial aid program could be subjected to Title IX. In any analogy between *Grove City* and this case, airport operators would be placed in the position of the college. It is readily apparent that our conclusion in *Grove City* that only a portion of the college was covered by Title IX cannot support the conclusion that commercial air transportation—a concept much larger than the airports—is the program or activity covered by § 504. The Court of Appeals' attempt to fuse airports and airlines into a single program or activity is unavailing. It is by reference to the grant statute, and not to hypothetical collective concepts like commercial aviation or interstate highway transportation, that the relevant program or activity is determined.

## IV

The Court of Appeals also held that the federally provided air traffic control system is a form of federal financial assistance to airlines.[13] The Federal Government spends some

---

[13] The Court of Appeals concluded that the air traffic control system constituted federal financial assistance, without specifically concluding that the on-board activities of commercial airlines are a program or activity receiving that assistance. Respondents have suggested that we do not need to reach the question whether the air traffic control system is federal

$2 billion annually to run this system 24 hours a day nation-wide and in various spots around the world. The air traffic controllers are federal employees, and the Federal Government finances operation of the terminal control facilities. In short, the air traffic control system is "owned and operated" by the United States. For that reason, the air traffic control system is not "federal financial assistance" at all. Rather, it is a federally conducted program that has many beneficia-ries but no recipients. The legislative history of Title VI makes clear that such programs do not constitute federal financial assistance to anyone. As then-Deputy Attorney General Katzenbach explained:

> "Activities wholly carried out by the United States with Federal funds, such as river and harbor improvements and other public works, defense installations, veterans' hospitals, mail service, etc., are not included in the list [of federally assisted programs]. Such activities, being wholly owned by, and operated by or for, the United States, cannot fairly be described as receiving Federal 'assistance.' While they may result in general economic benefit to neighboring communities, such benefit is not considered to be financial assistance to a program or ac-tivity within the meaning of title VI." 110 Cong. Rec. 13380 (1964).

That reasoning, of course, applies with equal force to § 504. The federal air traffic control system is a public program that does not involve "financial assistance" to anyone.[14]

---

financial assistance. We disagree. If we did not reach the issue, then on remand DOT would be required to formulate its policies in accordance with the conclusion of the Court of Appeals.

[14] The Court of Appeals reasoned that the air traffic control system con-stitutes federal financial assistance because the Federal Government is providing the airlines the services of federal personnel. That reasoning is inconsistent with the longstanding and consistent interpretation of the relevant agencies. FAA, like other agencies, originally promulgated regulations implementing Title VI that defined federal financial assist-

## V

The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

The Court starts from the proposition that no federal funds under the Airport and Airway Improvement Act of 1982, 49 U. S. C. App. § 2201 *et seq.*, are disbursed directly to com-

ance in a way that allowed for nonmoney assistance. In its definition section, FAA included among possible forms of federal assistance the "detail of Federal personnel." 14 CFR § 15.23(3) (1965), 29 Fed. Reg. 19286 (1964). DOT's current Title VI regulations use the same phrase. 49 CFR § 21.23(c)(3) (1985). The air traffic control system does not involve the "detail" of federal personnel; there is, in fact, no other air traffic control entity to which federal personnel can be "detailed"—the system is self-contained. In 1978, pursuant to its responsibility to coordinate the implementation of regulations under § 504 by federal agencies, the Department of Health, Education, and Welfare (HEW) published guidelines that substituted the word "services" for "detail." 43 Fed. Reg. 2137. But at the same time HEW explained that it did not intend any substantive change in the definitions:

"Despite some difference in the wording of the definitions of federal financial assistance in the regulations implementing section 504 and title VI, the substance of the two definitions does not differ." *Id.*, at 2132.

Later, the Department of Justice was given the task of coordinating the regulations under various civil rights laws, including § 504. Exec. Order No. 12250, 3 CFR 298 (1980). It retained the HEW definition of federal financial assistance that included "[s]ervices of Federal personnel." 28 CFR § 41.3(e)(2) (1985). Since the first regulations under Title VI, the interpretation of federal financial assistance has been that the detail, or loan, of federal personnel can constitute federal assistance. "Services" in this context means "detail." No such selection of federal personnel for a particular duty is involved here. The Court of Appeals erred in ignoring this longstanding administrative interpretation. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). We note that any other interpretation would give almost limitless meaning to the term "federal financial assistance."

mercial airlines. It infers that commercial airlines therefore do not "receive" federal financial assistance. And it concludes that § 504 of the Rehabilitation Act of 1973 is therefore wholly inapplicable to those airlines. That reasoning misperceives the proper inquiry under § 504.

Section 504 provides that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U. S. C. § 794. The appropriate question is thus not whether commercial airlines "receive" federal financial assistance. Rather, it is whether commercial airlines are in a position to "exclud[e handicapped persons] from the participation in, . . . den[y them] the benefits of, or . . . subjec[t them] to discrimination under" a program or activity receiving federal financial assistance or conducted by an Executive agency. I believe that they are, and I therefore dissent.

## I

The Court begins its analysis at the proper place: the underlying grant statute. See Note, 83 Colum. L. Rev. 1210, 1227–1232 (1983). The Airport and Airway Improvement Act of 1982 (Act), which replaced the Airport and Airway Development Act of 1970, Pub. L. 91–258, 84 Stat. 219 *et seq.*, is designed to ensure "the safe operation of the airport and airway system" and to ensure that system's more effective management and utilization. 49 U. S. C. App. §§ 2201(a)(1), (2). To that end, the Act authorizes the Secretary of Transportation to make grants to owners of public-use airports and to certain governmental units for airport development and airport planning. §§ 2204(a), 2208(a). It provides for certain other disbursements to airport owners and to States for the same purposes. §§ 2206, 2207. It authorizes the Secretary to expend other funds for the purposes of acquiring, estab-

lishing, and improving air navigation facilities, § 2205(a), and operating and maintaining those facilities, § 2205(c), for associated research and demonstration projects, § 2205(b), and for certain weather reporting services, § 2205(d). The Act finally directs the Secretary to fund the Explosive Detection K-9 Team Training Program for the purpose of detecting explosives at airports and aboard aircraft. § 2225.

The majority never explains the scope of the "program or activity receiving Federal financial assistance or . . . conducted by any Executive agency" that it believes the Act creates. In light of the Court's treatment of the "program or activity" issue in *Grove City College* v. *Bell*, 465 U. S. 555 (1984), I believe that the Act is most naturally viewed as creating "programs" or "activities" relating to the construction and maintenance of safe and efficient airports, and the creation of safe airways. That, however, is not the end of the inquiry.

The next question is whether the Department of Transportation (DOT) has jurisdiction under § 504 to regulate commercial airlines in order to ensure that handicapped individuals are not "excluded from the participation in, . . . denied the benefits of, or . . . subjected to discrimination under" those programs or activities.[1] In my view, the nature of airline transportation demands that DOT have such authority. If commercial airline companies barred the handicapped from traveling on their airlines at all, then that conduct would deny the handicapped the benefits of federally funded and conducted programs and activities relating to the airport and airway system. When commercial airlines allow the handicapped to travel on airlines, but, unreasonably and solely be-

---

[1] The original rulemaking proceedings in this case were undertaken by the Civil Aeronautics Board (CAB). As the Court explains, *ante,* at 600, n. 3, however, the relevant functions of the CAB were transferred to DOT under the Civil Aeronautics Board Sunset Act of 1984, Pub. L. 98–443, 98 Stat. 1703 *et seq.* See also *Paralyzed Veterans of America* v. *CAB,* 243 U. S. App. D. C. 237, 267, 752 F. 2d 694, 724 (1985).

cause of their handicap, force them to do so under conditions not substantially equal to those enjoyed by persons who are not handicapped, I believe that there too the airlines discriminatorily deny the handicapped the benefits of federally funded programs or activities supporting the airport and airway system.

This result derives from the fact that commercial airlines are in a unique position to deny public access to federally funded airport and airway services. It is true, as the Court points out, that the airport and airway system benefits a wide variety of persons and entities, including some who never fly. See *ante,* at 608–610. At the same time, however, a critical and obvious benefit of the airport and airway system, for members of the general public, is that it allows them to purchase tickets on airlines and to travel from city to city. The vast majority of members of the general public can enjoy that benefit only to the extent allowed, and under conditions set, by commercial airlines. Commercial airlines thus necessarily act as gatekeepers controlling who shall enjoy, and under what conditions, important benefits under federally funded and conducted programs. The airlines' position, as a result, is quite different from that of the trucking firms and delivery services referred to by the majority, *ante,* at 611.[2]

The Civil Aeronautics Board (CAB), in promulgating the rules at issue in this case, apparently relied on an understanding that §504 gave it no authority whatsoever to regu-

---

[2] The majority ignores this aspect of the question presented by the parties by relying unwaveringly on the fact that, as a general matter, no federal funds are disbursed directly to commercial airlines. The Court, however, has never held that fact dispositive. In *Grove City College* v. *Bell,* 465 U. S. 555 (1984), indeed, on which the majority heavily relies, the federal funds triggering Title IX coverage were not disbursed to Grove City College at all, but to some of its students. We nonetheless found part of the college subject to Title IX. Cf. *Frazier* v. *Board of Trustees of Northwest Mississippi Regional Medical Center,* 765 F. 2d 1278, 1290 (CA5 1985).

late the activities of commercial airlines not receiving direct subsidies under §§ 406 or 419 of the Federal Aviation Act, 49 U. S. C. App. §§ 1376, 1389 (1982 ed. and Supp. II). See App. 88a–89a. For the reasons stated above, I believe that that conclusion was in error. I therefore agree with the Court of Appeals that the regulations should be remanded to DOT to be reconsidered in the light of a proper understanding of the agency's authority under § 504.

## II

Were this case to be remanded, it would be appropriate for DOT to proceed upon an additional premise not available to the CAB in its original rulemaking proceeding: that DOT has power, through regulation of *airport operators*, to ensure that commercial airlines do not discriminatorily deprive handicapped persons of the benefits of federal programs supporting the airport and airway system.[3] In order to serve an airport, an air carrier must enter into a lease with the airport operator for the use of airport facilities. DOT has power to direct each federally assisted airport, as part of that lease, to secure from all air carriers serving the airport an assurance of compliance with regulatory standards for service to handicapped persons.[4]

---

[3] At the time of the original rulemaking proceeding, the involved federal agencies had apparently agreed that regulation of airlines would be in the hands of the CAB, but that regulation of airport operators would be left to DOT. See 44 Fed. Reg. 31451 (1979). DOT, in fact, postponed its inquiry into whether it should require airport operators, "through their leasing agreements with the airlines," to require the airlines to provide service to the handicapped on a nondiscriminatory basis, because the CAB was considering imposing such regulation on the airlines directly. *Ibid.* At present, DOT exercises jurisdiction over both airlines and airport operators.

[4] DOT officials, at least in the past, have shared this view. See Review of Airline Deregulation and Sunset of the Civil Aeronautics Board (Legislative Proposals Relating to Airline Deregulation and CAB Sunset): Hearings before the Subcommittee on Aviation of the House Committee on Public Works and Transportation, 98th Cong., 2d Sess., 16 (1984) (statement of James Burnley, Deputy Secretary of Transportation) ("I don't

Such a requirement would be a proper exercise of authority under § 504. For the reasons stated above, discrimination by commercial airlines against handicapped persons deprives those persons of equal access to the benefits provided by federally supported airport and airway programs. An airport can properly be considered in violation of § 504 when, through its contractual agreement with the airlines, it perpetuates discrimination against handicapped persons giving those persons unequal access to those programs. See 49 CFR § 27.7 (1985).

### III

This case raises important and difficult issues regarding the extent of federal regulatory authority over entities, not themselves direct recipients of federal financial assistance, that nonetheless, in important respects, control the terms of public access to the benefits of such assistance. The majority ignores these issues because it believes that the single question whether commercial airlines are direct "recipients" of federal financial assistance disposes of this case. Because I find the matter more complicated than that, I dissent.

---

think there is any question that we would have the authority to require a federally assisted airport in its contracts with carriers, who are given the right to use the facilities at those airports, that they provide that there will be no discrimination against the handicapped"); see also 44 Fed. Reg. 31451 (1979).