**Billy J. HAMILTON, Plaintiff,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Defendant.**

Civ. A. No. 3:94–CV–731BN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 9, 1995.

Richard A. Courtney, Frascogna, Courtney, Wright & Biederharn, Jackson, MS, Mark Randall Holmes, W. Stewart Robison, Robison & Harbour, McComb, MS, for Billy J. Hamilton.

Rachael A. Hetherington, Charles T. Ozier, Wise, Carter, Child & Caraway, Jackson, MS, for Illinois Cent. R. Co.

### OPINION AND ORDER

BARBOUR, Chief Judge.

The Court has before it the Motion for Summary Judgment of Defendant Illinois

Central Railroad Company ("ICR"). Having considered the supporting and opposing memoranda and the attached exhibits, the Court rules that Defendant's Motion for Summary Judgment is well taken and should be granted, and Plaintiff's cause of action should be dismissed with prejudice.

## I. *Background*

### A. Procedural Background

Plaintiff Billy Hamilton ("Hamilton") commenced this lawsuit against Defendant ICR alleging unlawful discrimination in violation of Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 794. In response, ICR filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and Motion to Strike. Finding the Motion for Summary Judgment premature, the Court entered an Order on February 17, 1995, to hold in abeyance a ruling on the motion pending further discovery on the issue presented therein. By way of a June 5, 1995, Order, the Court denied the Motion to Dismiss and granted the Motion to Strike. However, with respect to the Motion for Summary Judgment, the Court continued to abide by its previous Order to await additional discovery and left outstanding a ruling on the motion. The parties have since advised the Court that discovery is complete on the issue presented in Defendant's Motion for Summary Judgment, and the motion is now properly before the Court for consideration.

### B. Facts

For the purposes of the present motion, the following facts are undisputed:

By 1988, Plaintiff Billy Hamilton had been employed as a locomotive engineer for ICR for fifteen years. He underwent surgery for removal of an acoustic tumor in June of that year. In December of 1988, Hamilton's treating physician, Dr. John Shea, III, released Hamilton to return to work with the restriction that he wear hearing protection to protect his remaining hearing. On January 19, 1989, the ICR Chief Medical Officer certified Hamilton as physically qualified to return to work with the accommodation that he was to wear hearing protection at all times while on duty. ICR then advised Hamilton that, for safety reasons, it could not accommodate the hearing protection restrictions and refused to allow him to return to his employment as an engineer. However, in January of 1993, ICR reinstated Hamilton to his former position with the required hearing protection.

In the present action, Hamilton asserts that the refusal of ICR to reinstate him to his employment following his surgery comprised unlawful discrimination under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701—797 (1985 & Supp.1995). Hamilton seeks compensation for the wages he lost during his employment hiatus. ICR contends in its present Motion for Summary Judgment that Hamilton's action against it should be dismissed since the Rehabilitation Act only prohibits discrimination in a program or activity receiving federal financial assistance and Hamilton can produce no evidence showing that, during the time of events at issue, ICR received any such assistance.

## II. *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Moore v. Mississippi Valley State Univ.,* 871 F.2d 545, 549 (5th Cir.1989); *Washington v. Armstrong World Indus.,* 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of

the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The movant need not, however, support the motion with materials that negate the opponent's claim. *Id.* As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. *Id.* at 323–324, 106 S.Ct. at 2552–53. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

 Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, . . . since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir.1980). Summary judgment is improper where the court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir.1962).

### III. *Discussion*

#### A. The Rehabilitation Act

 Section 504 of the Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activ-

ity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). As both parties correctly point out, section 504 restricts the scope of the Rehabilitation Act to a "program or activity" that receives federal financial assistance. *United States Dep't of Transp. v. Paralyzed Veterans,* 477 U.S. 597, 604, 106 S.Ct. 2705, 2710, 91 L.Ed.2d 494 (1986).[1] Thus, in order to state a claim under the Rehabilitation Act, Hamilton must show that ICR received federal financial assistance during the time period in which the alleged discriminatory conduct took place. *See, e.g., Stephanidis v. Yale University,* 652 F.Supp. 110, 113 (D.Conn.1986), *aff'd,* 814 F.2d 654 (2d Cir.1987) (dismissing Rehabilitation Act claim because Defendant did not receive federal grants during year in which alleged discriminatory conduct occurred).

Initially, Hamilton attempted to characterize ICR as a "recipient" within the meaning of the Rehabilitation Act by alleging that ICR "received federal financial assistance, under the Railroad Revitalization and Regulatory Reform Act of 1976 ("4–R Act"), 45 U.S.C. § 803 et seq. and/or other programs." Complaint, ¶ 10. However, ICR responded in its Motion for Summary Judgment and itemization of supporting facts that at no time did it receive federal funds or assistance, either directly or indirectly, under the 4–R Act or any other program. Based on the parties' subsequent pleadings, it is apparent to the Court that Hamilton has abandoned his previous allegation that ICR received federal funds under the 4–R Act and is instead asserting that ICR received federal financial assistance through another source, specifically, the Highway Safety Act of 1973 ("Highway Safety Act"), Pub.L. No. 93–87, 87 Stat. 283 (codified as amended at 23 U.S.C. §§ 101–410 (1990 & Supp.1995)).[2]

---

1. The requirement of federal financial assistance is a contractual quid pro quo by which Congress conditions disbursements of federal funds on compliance with the anti-discrimination provisions of the Rehabilitation Act. *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 633, 104 S.Ct. 1248, 1254, 79 L.Ed.2d 568 (1984). In 1988, Congress amended Section 504 by passing the Civil Rights Restoration Act of 1987 ("Restoration Act"), Pub.L. No. 100–259, 102 Stat. 28, 29 (1988) (current version at 29 U.S.C.

§ 794(b)(1)), which broadened the definition of "program or activity" to include all the operations of an entity that received federal funds.

2. The Court has read carefully Plaintiff's Complaint and Response to Defendant's Motion for Summary Judgment and finds no allegations that Defendant received federal financing assistance from a source other than the Highway Safety Act.

As a preliminary matter, ICR argues that Hamilton failed to specifically contest the facts set forth in its itemization of material facts as required by Local Rule 8, and that this failure should result in a stipulation of those facts. While Hamilton failed to file an itemization of specifically contested facts pursuant to Local Rule 8, this failure is procedural and the Court, after reviewing Plaintiff's brief in support of his response, finds that Plaintiff does refute Defendant's contention concerning the applicability of the Rehabilitation Act. Even if this procedural failure constitutes a stipulation by Hamilton that ICR did not receive federal assistance under the 4–R Act, this does not preclude the Court from addressing the substantive issue in this case, which is whether ICR received federal assistance from some other source. Thus, for the purposes of this motion, the narrow question presented is whether, as a matter of law, ICR received federal financial assistance under the Highway Safety Act.

B. The Highway Safety Act of 1973

In an effort to improve highway safety and reduce the number of traffic accidents in the United States, Congress enacted the Highway Safety Act of 1973. Through Section 203 of the Act, Congress sought to improve highway safety at all railroad crossings by requiring:

> Each state [to] conduct and systematically maintain a survey of all highways, to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.

23 U.S.C. § 130(d) (1990). States in compliance with this Congressional directive are eligible to receive federal funding which Section 203 authorizes to defray the cost of railroad improvement projects. 23 U.S.C. § 130(a) (1990). The implementing regulations of the Highway Safety Act direct the states to concentrate on projects that will eliminate hazards of railroad crossings such as: (1) Grade crossing elimination; (2) Reconstruction of existing grade separations; and (3) Grade crossing improvements. 23 C.F.R. § 646.206 (1994). With respect to federal funding of these, and other railroad hazard projects, the regulations provide that any eligible State may choose an appropriate federal funding alternative set forth in 23 U.S.C. §§ 120(a), 120(c), 120(d), or 130. 23 C.F.R. § 646.208.

There is generally no requirement that railroad companies share the costs of hazard elimination projects with the State, 23 C.F.R. §§ 646.210(b)(1)–(4), unless they receive a net benefit from the project as determined by the Secretary of Transportation. 23 U.S.C. §§ 130(b), 130(c). With respect to grade-crossing improvement projects, the Secretary has promulgated regulations expressly stating that such projects "are deemed to be of no ascertainable net benefit to the railroads and there shall be no required railroad share of the costs." 23 C.F.R. § 646.210. Although states cannot compel railroads to participate in projects authorized under the Highway Safety Act, the regulations permit a State to enter into contractual arrangements with a railroad company whereby the railroad agrees to purchase and install the safety improvement. 23 C.F.R. §§ 646.216(d)(3)–(f). While the Federal Government is not a party to these State-railroad agreements, these arrangements, and the underlying project, are subject to the approval of the Federal Highway Administration. *Id.* When a State chooses to engage the services of a railroad company to implement hazard improvement projects before that State receives federal funds, the regulations prescribe a procedure by which the State can seek reimbursement of the actual cost of those services from the Federal Government. *See* 23 C.F.R. §§ 140.900–140.922.

C. Application of the Law to the Facts of This Case

Both parties agree that ICR participated in grade-crossing projects in Mississippi from 1988 to present under the Highway Safety Act and applicable regulations. However, the parties dispute whether the Defendant's participation in hazard elimination projects amounts to the receipt of federal financial assistance as required by the Rehabilitation Act. In support of their respective positions, both parties rely on the unrebutted testimony of Tom Zeinz ("Zeinz"), an Engineer of Public Works at ICR. Zeinz's job duties at

ICR require him to work with state and local governments on public improvement projects, including grade-crossing projects under the Highway Safety Act. With respect to Defendant's involvement with grade-crossing projects, Zeinz testified that the State of Mississippi identifies railroad-highway grade crossing project locations, decides what safety improvements should be made, and then contracts with ICR to purchase and install the desired improvement. According to Zeinz, when ICR completes a grade-crossing improvement, it bills the state for its actual costs. The State pays ICR and then the State seeks to have 80 percent of this expense reimbursed from federal funds made available to the states through the Highway Trust Fund.[3]

Hamilton argues that ICR received federal financial assistance because it contracted to make grade-crossing improvements with the State of Mississippi, which received federal funding by way of reimbursements for such projects under the Highway Safety Act. On the other hand, ICR contends that under the Highway Safety Act, the State of Mississippi and/or its political subdivisions are the actual recipients of federal funds, and therefore, Defendant's participation in grade-crossing projects does not amount to the receipt of federal funds for purposes of the Rehabilitation Act. The parties have not cited, and this Court has not found through its own research, authority which specifically addresses whether the reimbursement scheme authorized by the Highway Safety Act satisfies the "federal financial assistance" requirement of the Rehabilitation Act.

In *United States Dep't of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 604–05, 106 S.Ct. 2705, 2710–11, 91 L.Ed.2d 494 (1986), the United States Supreme Court stated that the proper scope of the Rehabilitation Act is determined by "identify[ing] the recipient of the federal assistance." According to the Court, the terms of the underlying grant statute in question should be the initial focus of this inquiry. *Paralyzed Veterans,* 477 U.S. at 604, 106 S.Ct. at 2710. The grant

statute relied on by Hamilton is the Highway Safety Act. The stated purpose of the Act is to develop and implement a comprehensive national highway safety improvement program by providing direct federal assistance to the states where such highways are located. *See* Highway Safety Act of 1973, Pub.L. No. 93–87, § 203, 87 Stat. 283; 23 C.F.R. § 924.1; *see also* 23 U.S.C. §§ 120(a)–(d); 130(a)–(d); 23 C.F.R. §§ 140.900–140.922; 646.200–646.220. Under the applicable policies and procedures, there is no question that Congress intended the State of Mississippi and/or its political subdivisions to receive direct federal assistance for the purpose of improving the safety of highways and railroad crossings. However, nothing contained in the language of the Act or the applicable regulations indicates a Congressional intent to place the burden of improving the safety of the nation's highways and railroad crossings on railroad companies or to provide federal assistance directly to them for that purpose.

■ Consistent with *Paralyzed Veterans,* a "program or activity" need not directly receive federal financial assistance. Indirect receipt of federal funds through a conduit source is sufficient to trigger the prohibitions of the Rehabilitation Act. *See Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984); *Bentley v. Cleveland County Bd. of County Comm'rs,* 41 F.3d 600 (10th Cir.1994); *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical,* 765 F.2d 1278, *modified,* 777 F.2d 329 (5th Cir.1985); *Graves v. Methodist Youth Services,* 624 F.Supp. 429 (N.D.Ill.1985). Relying on these cases, Hamilton contends that ICR received federal financial assistance because it contracted to make grade-crossing improvements with the State of Mississippi which received federal funding by way of reimbursements for such projects under the Highway Safety Act. However, as discussed more fully below, Hamilton's reliance on these decisions for the proposition that ICR received federal financial assistance is misplaced.

---

**3.** Zeinz's testimony regarding the Defendant's role in grade-crossing hazard elimination projects is consistent with the statutory and administrative procedures noted above. *See* 23 U.S.C. §§ 120(a)–(d); 130(a)–(d); 23 C.F.R. §§ 140.900–140.922; 646.200–646.220.

In *Grove City*, the issue confronting the Supreme Court was whether Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a), which prohibits sex discrimination in "any education program or activity receiving Federal financial assistance," applied to a private college by virtue of its enrollment of a large number of students who received Basic Educational Opportunity Grants under 20 U.S.C. § 1070(a). 465 U.S. at 558–60, 104 S.Ct. at 1213–15. In reaching its conclusion that the college, which accepted no direct federal aid, was an indirect recipient of federal financial assistance, the Supreme Court placed great weight on the legislative history of the Education Amendments Act "evincing Congress' awareness that the student assistance programs ... would significantly aid colleges and universities." *Id.* at 565, 104 S.Ct. at 1217. Indeed, one of the stated purposes of the student aid grant provisions was to "provid[e] assistance to institutions of higher education." *Id.* (citing 20 U.S.C. § 1070(a)(5)). Moreover, the Supreme Court noted that the college was free to terminate its participation in the federal grant program and thus avoid the anti-discrimination provisions of Title IX. *Id.* at 565 n. 13, 104 S.Ct. at 1217.

In the instant case, there is no evidence that Congress intended to assist, aid or subsidize railroad companies, such as ICR, by disbursing federal funds to the State under the Highway Safety Act. While there is some appeal to Hamilton's contention that the reimbursement scheme available under the Act creates a federal funding nexus between ICR and the State of Mississippi, the Court is not persuaded by this argument. Rather, the Court finds that ICR is in no position to accept or reject the obligations imposed by the Highway Safety Act as part of the decision whether or not to receive federal funds. *Compare Paralyzed Veterans,* 477 U.S. at 606, 106 S.Ct. at 2711 *with Grove City,* 465 U.S. at 565 n. 13, 104 S.Ct. at 1217 n. 13. The Highway Safety Act imposes a duty on the states to locate hazardous locations and implement safety improvement programs. In return, states in compliance with this directive are eligible and may apply for federal financial assistance. ICR is merely a contractor whose services the State may or may not wish to engage in implementing its safety improvement projects. As such, ICR is in no position to decide whether the State will or will not comply with the Highway Safety Act and plays no role in the application for or receipt of federal funds by the State.

■ In addition, the payments which ICR receives from the State under contracts to implement grade-crossing projects resemble compensation for services rendered rather than federal aid. As opposed to a government subsidy, purely compensatory payments pursuant to a contract for services do not constitute federal financial assistance. *See DeVargas v. Mason & Silas–Mason Co., Inc.,* 911 F.2d 1377, 1383 (10th Cir.1990) (rejecting argument that Rehabilitation Act applied to Defendant that received compensation under a contract to provide guard services to the government), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Mass v. Martin Marietta Corp.,* 805 F.Supp. 1530, 1543 (D.Colo.1992) (dismissing Rehabilitation Act claim because payments made by government to Defendant were compensation for services performed under a contract to provide services for the government). After a close reading of the Highway Safety Act and the applicable regulations, the Court finds no evidence that Congress or the Federal Government intended to provide assistance to or subsidize the operations of railroad companies through this legislation. Rather, the Court concludes that the intended purpose of the reimbursement procedure was merely to compensate the railroad companies for their services.

Although the decision reached by the Fifth Circuit Court of Appeals in *Frazier,* 765 F.2d at 1288, regarding the scope of the Rehabilitation Act presents a closer case, it too is distinguishable from the instant facts. In *Frazier,* the issue was whether a private corporation that provided respiratory therapy care under contract to a county hospital that received federal funding via Medicare and Medicaid payments was a recipient of federal funds under the Rehabilitation Act. *Id.* at 1288–289. After examining the financial relationship between the hospital and corporation, the Fifth Circuit concluded that

the financial nexus was sufficiently close to render the corporation as well as the hospital a direct recipient of federal financial assistance. *Id.* at 1289 (citing *Grove City,* 465 U.S. at 565, 104 S.Ct. at 1217). Under the contractual arrangement between the hospital and the corporation, Medicare and Medicaid payments in the form of reimbursements went directly to the hospital. *Id.* Every month the corporation would bill the hospital for respiratory services rendered during that period, and the hospital would remit payment out of a general fund composed of part federal (Medicare and Medicaid receipts) and part non-federal monies. *Id.* Because both the hospital and the corporation derived a significant portion of their revenue, and thus a substantial benefit, from Medicare and Medicaid payments, the *Frazier* Court found their financial interests inextricably linked. *Id.* at 1289–290. In reaching this conclusion, the court noted:

> It is this mutual benefit that distinguishes [the corporation's] womb-like financial situation from that of a private contractor with no material relationship to the recipient's receipt of federal funds. Unlike the hospital's [other private contractors, the corporation] contributes in a direct and tangible way to the hospital's claims for reimbursement under Medicare and Medicaid.

*Id.* at 1290. However, the court went on to restrict its holding to the facts before it by stating in a footnote:

> Lest we be misconstrued, *we do not hold that independent contractors who perform services for recipients of federal funds become recipients of federal funds by virtue of a vicarious relationship through the primary recipient.* Rather, we hold that the financial nexus of [the corporation] to these Medicare and Medicaid funds is sufficiently close to render [the corporation] itself a primary recipient of federal financial assistance.

*Id.* at 1290 n. 29 (emphasis added).

Despite Hamilton's effort to equate the contractor status of ICR with that of the corporation in *Frazier,* the two entities are not similarly situated because the financial nexus present in *Frazier* is absent in the instant case. Unlike the corporation in *Fra-* zier, ICR does not receive a significant portion of its revenues, nor does it receive a substantial benefit, from its participation in the hazard elimination program. Because the regulations limit the amount of the reimbursement to the actual cost of the services of the railroad, ICR does not profit from the hazard elimination contracts for grade crossing improvements. *See* 23 C.F.R. §§ 140.900–140.922 (listing railroad charges which State may seek federal reimbursement for). In fact, according to the unrebutted testimony of Zeinz, ICR actually loses money on some grade-crossing improvement projects because certain indirect expenses not provided for in the regulations are not billable to the State. Furthermore, as previously noted, ICR does not participate in any material way in the State's claims for reimbursement from the Federal Government.

With respect to any benefit which might accrue in favor of ICR through its participation in grade-crossing projects, the Act declares that "any railroad involved in a project for the elimination of hazards of railway-highway crossing" is liable for any net benefit to the railroad stemming from such projects. 23 U.S.C. § 130(c). In addition, the regulations specifically state that "[p]rojects for grade-crossing improvements are deemed to be of no ascertainable net benefit to the railroads...." 23 C.F.R. § 646.210(b). Assuming, without deciding, that ICR did benefit to some extent from State-railroad agreements, the case of *Paralyzed Veterans,* 477 U.S. at 607, 106 S.Ct. at 2712, holds that the Rehabilitation Act "covers those who receive federal aid, but does not extend as far as those who benefit from it." In *Paralyzed Veterans,* the Supreme Court held that although commercial airlines benefited from federal aid disbursed to airport operators under the Airport and Airway Development Act of 1970, 49 U.S.C. § 1701, they were not covered by the Rehabilitation Act. 477 U.S. at 611–12, 106 S.Ct. at 2714. The Court made a critical distinction between intended recipients of federal funds and intended beneficiaries and declined to adopt a view that:

> [V]arious industries and institutions would become part of a federally assisted program or activity, not because they had

received federal financial assistance, but because they are "inextricably intertwined" with an institution that has.

*Id.* at 610–11, 106 S.Ct. at 2713–14. By way of example, the Court expressly referred to the "mammoth program of interstate highway construction and maintenance" under the Federal–Aid Highway Act of 1956, Pub.L. 627, 70 Stat. 374, and found that:

> Congress in this program used a Trust Fund approach similar to the Airport and Airway Development Act of 1970. If we accepted the Court of Appeals' construction of "program or activity," we would also be compelled to conclude that industries that depend on the federally funded highways for their existence ... are part of a program or activity of national highway transportation. This interpretation of § 504 would give it a scope broader than its language implies, and one never intended by Congress.

*Id.* at 611, 106 S.Ct. at 2714; *see Independent Housing Servs. v. Fillmore Center*, 840 F.Supp. 1328, 1339 (N.D.Cal.1994) (following *Paralyzed Veterans* and holding Defendant who merely benefited from federal aid received by another was not covered by Rehabilitation Act).

■ The Court finds that under the Highway Safety Act and applicable regulations, ICR did not significantly profit or benefit from its participation in grade crossing projects, and therefore, its contractual relationship with the State of Mississippi is not sufficiently close to render it a direct or indirect recipient of federal financial assistance. Because the services performed by ICR for the State under the hazard elimination program did not "inextricably intertwine" the interests of ICR with those of the State, this Court finds the analysis of the Supreme Court in *Paralyzed Veterans* persuasive and declines to apply the narrow holding of *Frazier* in the instant case.[4]

### IV. *Conclusion*

■ While Rehabilitation Act coverage extends to both direct and indirect recipients of federal funds, it does not follow the federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement. In view of the preceding discussion, the Court concludes that under the Highway Safety Act it is the responsibility of the states (and not railroad companies) to improve the safety of highways and railroad crossings, and Congress endeavored to provide funding through the Act to the states (and not railroad companies) for that purpose. Accordingly, the Court finds that as a matter of law ICR did not receive federal financial assistance as required by the Rehabilitation Act under the Highway Safety Act during the time of events at issue.

IT IS THEREFORE ORDERED that the Motion for Summary Judgment of the Defendant Illinois Central Railroad is granted.

IT IS FURTHER ORDERED that all causes of action of the Plaintiff Billy Hamilton in the above styled cause of action should be and are hereby dismissed, with prejudice, and final judgment should be entered in favor of the Defendant Illinois Central Railroad Company.

SO ORDERED.

---

4. Hamilton also relies on the cases of *Bentley*, 41 F.3d at 603–04, and *Graves*, 624 F.Supp. at 432–33, in support of his argument that ICR received federal financial assistance. However, because these cases are fact specific and stand only for the proposition that indirect receipt of federal funds is sufficient to trigger Rehabilitation Act coverage, they do not bolster his position and merit no further discussion.